[No. 3083.]

JOHN ALLEN v. THE STATE.

1. PRACTICE—EVIDENCE—WAIVER.—The State presented in evidence the affidavit of the owner of the alleged stolen property, to the effect that he never gave his consent to the taking of the property. To this affidavit was attached an agreement signed by the State's counsel and by the defendant and his counsel, and an attesting witness, to the effect that the affidavit should be read in evidence as the testimony of said owner. When offered, the defendant objected to it because, 1, the defendant had the right to be confronted by witnesses against him; and 2, because it was not proved that the defendant had ever signed the agreement. *Held,*

that the first objection was not tenable because the defendant had tl ɔ
personal power to waive any right secured to him except the right of
trial by jury. *Held*, further, that the second objection was tantamount
to a denial that the defendant executed the agreement. Under such cir-
cumstances it was incumbent on the State to prove its execution, either
by the attesting witness, if accessible, and if not, by competent second-
ary evidence, before the agreement or affidavit could be received in evi-
dence. See the opinion *in extenso* on the question.

2. CHARGE OF THE COURT.—CIRCUMSTANTIAL EVIDENCE alone being relied
upon by the State to secure a conviction in this case, it was the impera-
tive duty of the court, whether asked or not, to give in charge the law
controlling such evidence.

APPEAL from the District Court of Mitchell. Tried below be-
fore the Hon. T. B. Wheeler.

The indictment in this case charged the appellant with the
theft of one head of cattle, the property of one C. C. Slaughter.
His trial resulted in conviction, and he was awarded a term of
two years in the penitentiary.

The State first introduced an affidavit sworn to and subscribed
by C. C. Slaughter, to the effect that he had never given the de-
fendant his consent to the taking of the animal. Preliminary
to this evidence the prosecuting attorney read an agreement,
signed by himself on behalf of the State and by the defendant
and the defendant's former attorneys, and attested by one Rob-
inson, to the effect that the affidavit should be read in evidence
on the trial, as the testimony of C. C. Slaughter. The said
agreement waived the presence of the witness Slaughter.

Dave Earnest was the first witness placed upon the stand by
the State. He testified that he had known the defendant for
several years. He saw the defendant in Tom Green county, on
Lacey creek, about fifty miles south of Colorado, on or about the
first day of December, 1881. His wife, his son John, a young
man about twenty years old, his grown daughter, or step-daugh-
ter, and a boy fourteen or fifteen years old were with him. They
were then living in two tents. The defendant had a herd of
about fifty head of cattle, which he claimed to own, and over
which he exercised control. The witness cut a steer out of this
bunch, and had some contention with the defendant about its
ownership. The defendant claimed that he owned the cattle.
The cattle claimed by the defendant were branded JHC, con-
nected. About one month later the witness went to the defend-
ant's camp at Baldwin Springs, Martin county, about seventy

miles west of Colorado. This was about the first of January, 1882. Mrs. Allen, her daughter, or step-daughter, and the boy were at the camp at the time. They were living in two tents, and had in charge the same herd of cattle they had on Lacey creek, in Tom Green county. The witness recognized them as the same cattle by their appearance and brands. The herd numbered fifty or sixty head, the brands on more than half of them being fresh, and covering old or original brands. Witness did not see either the defendant or his son John at the Baldwin Springs camp on this visit. The settlement nearest this camp was thirty miles distant. Several rangers and one cowboy were with the witness at the Baldwin Springs camp. About ten days later witness was at Big Springs, in Howard county, and there saw twenty-five or thirty head of the same cattle he had seen in the herd at Baldwin Springs. The cattle were then in charge of Sheriff Ware, Ira Butler and several others, including some State rangers. They were driving the cattle toward Colorado City. Witness knew C. C. Slaughter. Slaughter was then living in Dallas. Witness had seen defendant hauling buffalo bones twice before he saw him on Lacey creek, in Tom Green county.

Ira Butler was the next witness for the State. He testified that at present and in the year 1881 he was cattle and hide inspector of Mitchell county. On or about the fifteenth day of January, 1882, he went to Baldwin Springs, or "Five Wells," as the place is sometimes called, in Martin county, to look after some cattle. He reached the springs between daylight and sunrise. He found the defendant's family camped there, living in two tents. Mrs. Allen, another woman, a boy about fifteen years old, and a man named Meek were at the camp when witness arrived. He did not see the defendant there at the time. Baldwin Springs was about thirty miles west of Big Springs, its nearest settlement. Witness found fifty or sixty head of cattle at the springs, some of which were claimed by Mrs. Allen as her separate, individual property. The brands on more than half of the cattle were fresh, and the old or original brands were burned or blotted out. Witness and his party brought off the cattle that had been rebranded, and on which the old brands had been blotted, leaving those Mrs. Allen claimed as her individual property. Those they took the party brought to Colorado City, where several were claimed and proved by various owners. The old brands on some of the cattle had been so burned and blotched that their

identification was impossible. These were subsequently sold, and the proceeds turned into the county treasury. Frank Vaughan, who was acting as the agent of C. C. Slaughter, and was looking after Slaughter's cattle, made affidavit that one cow belonged to C. C. Slaughter, and witness turned the cow over to him. When this cow was claimed by Vaughan the herd was being held on Lone Wolf creek, about a half mile east of the town of Colorado. The cow to which Vaughan made affidavit as the property of Slaughter was branded ∽ (recumbent), otherwise called a "long S;" also a sign somewhat in the shape of a T, known as a "fleur-de-lis." Slaughter was then a resident of of the city of Dallas. The long S brand had been recently burned or blotted, by running a hot iron through it, and another brand, which resembled JHC, connected, was found burned on the cow when claimed by Vaughan. The rebranding and the blotting of the old brand were recent, about four weeks old, and appeared to have occurred at the same time. The record of brands of Mitchell county showed Slaughter's cattle brand to be a long S on each side, and his mark to be an underbit in each ear.

J. M. McKenzie was the next witness for the State. He testified that he went with sheriff Ware, hide inspector Butler, Captain McMurray and others, to Five Wells or Baldwin Springs, in Martin county, to look after some cattle, in January, 1882. They secured the cattle they went for. The animals were in very bad condition and had evidently been close herded for some time, and many of them, as shown by creased hocks, had been hobbled. Of the sixty head of cattle found at the Wells, about half of them had been rebranded, the old or original brands being burned or blotted out. The defendant was not at the Wells when the party arrived. His wife, another lady, a boy fourteen or fifteen years old, and Mr. J. J. Meek were there. All of the cattle that had been recently burned or rebranded were taken by the party and driven to Colorado Springs. Five Wells or Baldwin Springs was a place on the plains, distant thirty miles from either settlement or ranch. The burning or blotching of the old brands seemed to have been done by drawing a hot iron across them. The burns and the new brands were beginning to peel when the cattle were taken, and appeared to be about thirty days old. Some of the old brands were so completely obliterated by the burning that identification was impossible. Several of the cattle, when brought to Colorado City, were identified

and claimed by different owners, and among them one was claimed for Mr. C. C. Slaughter. The witness saw one of C. C. Slaughter's cows in the bunch brought to Colorado City. Witness did not think he ever saw the defendant in possession of or exercising control over any of the twenty-five or thirty head of cattle brought to Colorado City from the Five Wells.

Frank Vaughan testified, for the State, that he was a resident of Mitchell county, and followed the cattle business. In January, 1882, he saw a bunch of twenty-five or thirty head of cattle herded on Lone Wolf creek, about a half mile from Colorado City, by sheriff Ware, inspector Butler, and some State rangers. Among them he found a cow belonging to Mr. C. C. Slaughter, for whom the witness was working at that time. Witness made affidavit of Slaughter's ownership, and received the cow from inspector Butler. Witness did not know where Slaughter was at the time that the cow was taken. This cow had two old brands on her, a long S, which was Slaughter's regular ranch brand, and the sign of the *fleur-de-lis.* This last was not Slaughter's regular brand, but was a road brand he had put on a large number of his cattle. Of late years Slaughter had put the long S brand on both sides of the increase of his cattle. His old cattle are so branded only on one side.

The long S brand on the Slaughter cow recovered by the witness had been mutilated by drawing, with a hot iron, two bars across it lengthwise. A fresh brand, JHC, connected, had also been burned on her. The fresh brand and the mutilating bars were evidently put on her at the same time, which, judging from appearances, was about four weeks before the cow was recovered. Witness saw other freshly branded and brand burned cows in the same bunch when he recovered the Slaughter cow. Witness had never seen the cow in defendant's possession, and did not know who burned the old brand, or who rebranded her JHC.

Sheriff Ware was the next witness for the State. He testified that he had partially known the defendant for the last seven years, and had frequently seen him in Mitchell and Howard counties. Witness, with inspector Butler, Captain McMurray and several rangers, went to defendant's camp, at Baldwin Springs, in Martin county, in January, 1882, arriving there about daylight. Mrs. Allen, defendant's wife, Mrs. Blair, her step-daughter or daughter-in-law, a fifteen-year-old boy, and a man named Meek were at the camp, at which place some fifty

or sixty head of cattle were also found. Defendant was not at the camp. Witness and party hunted over the neighborhood, an open plain covering several miles, until after midday, for the defendant, but could not find him. The party then rounded the cattle up. Mrs. Allen claimed about twenty-five head of the cattle as her individual cattle. These were cut out and left, and the remaining ones were brought to Colorado City. None of the cattle left with Mrs. Allen were fresh branded or burned. From that time on, the witness made unsuccessful search in Texas for the defendant.

Baldwin Springs, or Five Wells, was seventy miles west of Colorado City, and, at that time, was far west of any settlement. The railroad had been built through that country, but neither ranch nor settlement was nearer than Big Springs, in Howard county, thirty miles distant. A section house stood at Marionfield, about seven miles south of Baldwin Springs. Some time later, the witness heard that the defendant was in the Territory of New Mexico, about four hundred miles from Colorado, and he went there and arrested defendant and his son John, junior. Defendant's family had then joined him in New Mexico. The arrest was made in September, 1883. John Allen, junior, has since died. Witness at no time saw the defendant in possession of the cattle.

J. J. Meek testified, for the State, that he lived in Wilbarger county, Texas. Witness first saw the defendant several years before this trial, when he, defendant, was engaged in hauling buffalo bones to market. Witness last saw him, before this trial, in January, 1882. Witness was then hunting buffaloes, and was camped on the extreme edge of Martin county, near the Andrews county line. The defendant and his son, a young man about twenty years old, came to witness's camp together. Witness had sprained his ankle, and was not able to do much, and wanted to get home. Defendant proposed to buy a buffalo gun the witness had, for which he agreed to pay fifty dollars in yearlings at six and a half dollars each. He told the witness that he had about seventy head of cattle at the Baldwin Springs. Witness agreed to go to defendant's camp and get the yearlings. *En route* the defendant said that he might be able to sell more cattle to witness. Witness and the Allens, traveling horse back, reached defendant's camp about dark. Defendant's wife, another woman and a boy were living there in two tents. After supper, the defendant and his son went off, and the witness did

not see them again.   Next morning, at daylight, sheriff Ware and his party came to the camp and drove off a part of the cattle.   Witness next saw the defendant on this trial.

The motion for new trial raised the questions discussed in the opinion.

*C. C. McGinnis,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State·

WHITE, PRESIDING JUDGE.   On the trial the State offered in evidence the affidavit of Slaughter, the alleged owner of the stolen animal, to the effect that he had never given defendant his consent to the taking of the animal.   To this affidavit was attached a written agreement, signed by the district attorney and also by the defendant, as well as by his attorneys, in which agreement it was stipulated that said affidavit should be taken as his (Slaughter's) full and unqualified evidence on this trial; "and that said statement is to be taken and admitted and *read* in evidence as the testimony of said Slaughter, without reservation, by both parties, as all that said Slaughter knows or can testify to in the said cause; and that said statement be taken and admitted in evidence as of the same weight and merit as if the said witness, C. C. Slaughter, were present at the trial of said cause, and making under oath as a witness the said statements that are included in said affidavit."   This agreement was witnessed by T. J. Roberson.

Two objections were interposed by defendant to the introduction of this affidavit and agreement as evidence.   "1.   That defendant had the right to be confronted by the witnesses against him.   2.   It was not proven that defendant had ever signed the agreement that the same should be read in evidence."   These objections were overruled, and the affidavit and agreement admitted in evidence, and defendant saved a bill of exceptions to the ruling.

So far as the first objection is concerned, it was not tenable. "The defendant to a criminal prosecution for any offense may waive any right secured to him by law except the right of trial by jury in a felony case."   (Code Crim. Proc., Art. 23.)   Here the defendant in person agreed that the affidavit might be read in evidence, and he expressly waived the personal attendance of the witness. This case is not like the case of *Bell* v. *The State,*

2 Texas Court of Appeals, 215, in which it was held that such an agreement made by the attorney for defendant was not legal or binding upon him.  Such an agreement, to be binding, must be made by the defendant himself, as was done in this case.

The second objection, we think, was tantamount to a denial that defendant had signed the agreement in writing to waive the personal presence of Slaughter as a witness.  This brought the execution of the writing, that is, the written agreement, in question.  It is a rule of evidence, well settled, that "if the execution of an instrument is to be proved, the primary evidence is the testimony of the subscribing witness, if there be one. Until it is shown that the production of the primary evidence is out of the party's power, no other proof of the fact is in general admitted." (1 Greenl. Ev., 13 ed., sec. 84.)

"So resolved," says Mr. Wharton, "are the courts in insisting on this rule, that in cases where subscribing witnesses are necessary, a party's admission has been held insufficient to dispense with the production of the attesting witness, even though such admission be made in open court." (1 Whart. Ev., sec. 725. See *White* v. *Holliday*, 20 Texas, 679.)  These are the rules where attesting witnesses are necessary to the validity of the instrument.  "Where attesting witnesses are not necessary to the validity of the instrument, it may be *prima facie* proved by the admissions of the party, provided such admissions are clear and specific as to the writing.   *   *   *    And such admission may be proved inferentially as well as directly." (1 Whart. Ev., sec. 725; 2 Whart. Ev., 2 ed., sec. 1092.)

In this case it was not necessary that there should have been an attesting witness to the execution of the written agreement. Still the parties seem to have thought proper to have it witnessed, and we have been unable to find any authority which takes this particular character of instrument out of the operation of the rules above enunciated.  If the witness could not be produced after diligent search, or was beyond the jurisdiction of the court, then the handwriting of said witness might have been proven. (1 Whart. Ev., sec. 726; Abbott's Trial Ev., 391.)  Or if after its execution the defendant had admitted *aliunde* its execution, then that admission would have proven it. If the absent attesting witness cannot be produced or accounted for, and his handwriting cannot be proven, or if no independent admission of execution by the objecting party can be proven, we can see no reason why the fact of the execution might not

be proven by any one who saw the parties sign and execute it. In secondary evidence there are no degrees, and we see no reason why this rule would not also allow such proof as that just mentioned. (*White* v. *Holliday*, 20 Texas, 679.) But some such proof must have been made before its introduction as evidence was admissible, where the objection to its introduction called its execution in question, as in this instance, and the court erred in its admission over the objection and without the necessary proof of execution. *Strippleman* v. *Clark*, 11 Texas, 296, is not analogous.

Again: the case as established by the proofs was one wholly of circumstantial evidence. Where such is the case the rule is imperative that, whether asked or not, the court should instruct the jury as to the law controlling that character of evidence. (13 Texas Ct. App., 51; Id., 309; Id., 493; Id., 669; 14 Texas Ct. App., 96; Id., 312, and authorities cited in those cases.)

For the errors discussed, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered May 17, 1884.